## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| **IN RE: SEARCH WARRANTS** | : | **MISC. NOS.** | **1:05-MC-0151** |
| **EXECUTED ON:** | : | | **1:05-MC-0152** |
| | : | | **1:05-MC-0153** |
| **309 PRIMROSE LANE** | : | | **1:05-MC-0154** |
| **HANOVER, PENNSYLVANIA  17331** | : | | **1:05-MC-0155** |
| | : | | **1:05-MC-0156** |
| **15 VILLA VISTA AVENUE** | : | | |
| **HANOVER, PENNSYLVANIA  17331** | : | **(Judge Conner)** | |
| | : | | |
| **95 NORTH ALLWOOD DRIVE** | : | | |
| **HANOVER, PENNSYLVANIA  17331** | : | | |
| | : | | |
| **GARY SOLLENBERGER,** | : | | |
| **AVERY SOLLENBERGER, and** | : | | |
| **WENDELL SOLLENBERGER** | : | | |
| | : | | |

### MEMORANDUM

Presently before the court are the Federal Rule of Criminal Procedure 41(g)[1]

motions for return of property, filed by Avery, Dena, Gary, and Wendell

Sollenberger (collectively "the Sollenbergers").[2]  The motions have been fully

briefed and are ripe for disposition.  For the reasons that follow, the court will deny

the motions.

---

[1]  As a result of the 2002 Amendments to Federal Rule of Criminal Procedure 41, the former Rule 41(e) "now appears with minor stylistic changes as Rule 41(g). For consistency, we will refer only to [Rule] 41(g) even though . . . most of the relevant case law refers to the previous rule."  See Peloro v. United States, 488 F.3d 163, 173 n.9 (3d Cir. 2007) (quoting United States v. Albinson, 356 F.3d 278, 279 n.1 (3d Cir. 2004)).

[2]  (See Misc. No. 1:05-MC-0151, Doc. 15; Misc. No. 1:05-MC-0152, Doc. 15; Misc. No. 1:05-MC-0153, Doc. 9; Misc. No. 1:05-MC-0154, Doc. 9; Misc. No. 1:05-MC-0155, Doc. 9; Misc. No. 1:05-MC-0156, Doc. 9.)

I.   **Findings of Fact**[3]

This matter arises out of the tax evasion investigation of the Sollenbergers conducted by the Internal Revenue Service ("IRS").  Avery and Dena Sollenberger, along with their two adult sons, Wendell and Gary, own and operate a construction company.  (Doc. 39 at 54.)[4]  From the tax period ending on December 31, 1996 through the tax period ending on December 31, 1999, the IRS assessed the following tax deficiencies, including interest and penalties, against the Sollenbergers and their company:  (1) $1,290,009.19 against Gary Sollenberger ("Gary"), (2) $1,298,010.44 against Wendell Sollenberger ("Wendell"), and (3) $1,151,910.85 against Avery and Dena Sollenberger.  (Doc. 24, Exs. 14, 16, 17.)  Because these

---

[3]   These findings are based on testimonial and documentary evidence presented at the hearing on the motions, as well as on affidavits proffered in support of the motions.  The findings substantially reflect the testimony given by the government agents.  The court notes that during the course of the hearing, the Sollenbergers attempted to impeach the credibility of IRS Special Agents Klinte J. Keppley and Chris Hueston.  However, the testimony of these agents was largely supported by that of four agents whose credibility was not impeached, namely IRS Special Agents Christopher D. Kegerreis, Ernest S. Binder, Martin McLaughlin, and Kelvin Bowser.  Given this degree of corroboration, the court finds the testimony of all six agents to be credible and resolves in favor of the agents any conflicts in testimony between the Sollenbergers and the agents.

[4]   For ease of reference, the court will include citations to the documents contained in civil action number 1:05-MC-0151.  All cited documents have also been filed in the five related civil actions numbered 1:05-MC-0152 to 1:05-MC-0156.

amounts remain outstanding, the government has filed tax liens on all property belonging to the Sollenbergers.[5]  (Doc. 24, Ex. 15.)

IRS Special Agent Klinte J. Keppley ("Agent Keppley") was the agent in charge of the investigation into the Sollenbergers' alleged criminal activity.  After investigating for nearly two years, Agent Keppley decided that he possessed the requisite probable cause to obtain search warrants for evidence of the Sollenbergers' unreported accumulation of wealth.  (Doc. 39 at 92-93.)  On May 31, 2005, Agent Keppley applied for search warrants for the persons of Avery, Gary, and Wendell Sollenberger, and for the following properties:  (1) 309 Primrose Lane, Hanover, Pennsylvania, which is the residence of Avery, Dena, and Wendell Sollenberger (hereinafter "Primrose Residence"), (2) 15 Villa Vista Avenue, Hanover, Pennsylvania, which is the residence of Gary Sollenberger (hereinafter "Villa Vista Residence"), and (3) 94 North Allwood Drive, Hanover, Pennsylvania, which is a storage barn used by the Sollenbergers.  (Doc. 23 at 7; Doc. 24, Exs. 1-6; Doc. 39 at 92-93.)  Magistrate Judge J. Andrew Smyser signed all six warrants.

---

[5]  These tax liens state:

As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer.  We have made a demand for payment of this liability, but it remains unpaid.  Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.

(Doc. 24, Exs. 14, 16, 17.)

(Doc. 24, Exs. 1-6.)  The search warrants authorized the seizure of financial records relating to the Sollenbergers' construction company and to any trusts and offshore bank accounts in which the Sollenbergers have placed assets.  (Doc. 23 at 8; Doc. 24, Ex. 7.)  The warrants also authorized the seizure of any items "evidencing the obtaining, secreting, transferring, concealment and or expenditures of money of either a personal or business nature."  (Doc. 24, Ex. 7 ¶ 10.)

At approximately 1:00 p.m. on May 31, 2005, Agent Keppley met with the search team leaders.  (Doc. 24, Ex. 10 ¶ 3.)  Each team leader was informed about the nature of the investigation and provided with copies of the search warrants and of the list of items to be seized.  (Id. ¶¶ 3-4.)  On the morning of June 1, 2005, the team leaders relayed this information to all of the agents that were to be involved in the search.  (Id. ¶ 5; Doc. 39 at 119, 130, 151-52.)

### A.    Search of the Primrose Residence

At approximately 9:00 a.m. on June 1, 2005, IRS Special Agents Keppley, Ernest S. Binder ("Agent Binder"), and Colleen Dunstone executed the search warrant for the Primrose Residence.  (Doc. 16 at 6; Doc. 23 at 10.)  When the agents arrived at the residence, they met Avery Sollenberger ("Avery") outside of his residence, advised him that they had a search warrant for the residence, and asked him if anyone was inside.  Avery responded that his wife, Dena Sollenberger ("Dena"), was inside.  (Doc. 24, Ex. 11 at 1.)  The agents then escorted Avery to the side door of the residence, at which point he informed Dena that the agents were there to execute a search warrant.  (Id.)  The agents entered the residence and

4

encountered Dena who was in the living room wearing a nightgown and bathrobe. (Id.)  The agents then searched Avery pursuant to the search warrant that they had for his person.  Dena was not searched.  (Id.)  Avery and Dena were informed that they were not under arrest and were free to leave the residence, but that if they chose to stay at the residence, they would not be permitted to move about freely as that could disrupt the search.  (Id.; Doc. 39 at 9, 152-53, 184.)  Both Avery and Dena chose to stay at the residence and remained seated in the living room for the duration of the search.  (Doc. 24, Ex. 11 at 2.)  Neither Dena nor Avery was restrained in any way.  (Doc. 39 at 152-53.)

During the search, IRS Special Agent Christopher Hueston ("Agent Hueston") interviewed Avery and Dena regarding their "use and abuse of trust products and their personal income as it relates to their tax filing."  (Doc. 24, Ex. 11 at 2; Doc. 39 at 155.)  Agent Hueston did not advise Avery and Dena of their Miranda rights because they were not in custody; however, Agent Hueston did advise them that they were not required to answer any questions posed to them by the agents.  (Doc. 39 at 10, 153.)  In fact, Avery specifically refused to answer certain questions, citing his Fifth Amendment rights.  (Doc. 24, Ex. 11 at 2.)  Agent Hueston was not rude and did not yell at or berate the Sollenbergers or coerce them into making any statements.  (Doc. 39 at 13, 155.)

Approximately ten agents then began searching the premises.  (Doc. 16 at 8-9; Doc. 39 at 119.)  In the basement and attic of the Primrose Residence, the agents discovered a total of six green plastic containers that were sealed and imprinted

5

with the words "U.S. Mint." (Doc. 16, Ex. 2 at 2-3; Doc. 39 at 120, 122, 131.) The agents broke the seals to the containers and opened each of them. (Doc. 39 at 121, 133.) Agents Martin McLaughlin ("Agent McLaughlin") and Kelvin Bowser ("Agent Bowser"), who executed the searches of the attic and basement, testified that they opened the containers because they could have contained documents and "smaller items such as safe deposit box keys." (Id. at 123, 134.) Inside each container, the agents found twenty-five tubes that were also imprinted with the words "U.S. Mint." (Doc. 16, Ex. 2 at 3.) The agents also discovered receipts in the containers indicating that the coins had been purchased during the time period relevant to the investigation. (Doc. 39 at 125, 134, 182-83.) The agents found thirteen additional tubes on a bookshelf in the basement. The agents opened all of the tubes and discovered twenty one-ounce silver coins in each. (Doc. 16, Ex. 2 at 3.) The agents also discovered:

   a.   Nine ten-ounce silver bars in the basement behind a header board;
   b.   Two constitutional coins in a navy blue case; and,
   c.   Three Olympics commemorative coins in a maroon case.

(Id. at 3-4.) All coins and bars were taken to the basement and inventoried. (Doc. 39 at 121-25, 133, 182.)

At some point during the search, Agent Binder called Wendell, advised him that agents were searching his home, and asked if he could return to the residence.[6] (Doc. 24, Ex. 13 at 3; Doc. 39 at 177.) Wendell complied, arriving at the residence at

---

[6] Wendell testified that Agent Binder *demanded* that he return home. (Doc. 16, Ex. B at 5; Doc. 39 at 14.)

approximately 10:15 a.m.  (Doc. 16, Ex. B at 5.)  When Wendell arrived at the residence, Agent Binder served him with a copy of the search warrant for his person and executed the warrant.  (Doc. 24, Ex. 13 at 3; Doc. 39 at 153, 177.) Wendell was advised that he could enter the residence but that, if he did so, he would need to remain in the living room until the search had been completed. (Doc. 24, Ex. 13 at 3; Doc. 39 at 16, 178.)  Wendell was also advised that he was not under arrest and was free to leave at any time.  (Doc. 39 at 153-54, 178, 184.)  In fact, Wendell left the residence at some point during the search and did not return. (Doc. 24, Ex. 13 at 3-4; Doc. 39 at 154.)

While Wendell was in the living room, Agents Binder, Keppley, and Hueston interviewed him.  Agent Binder informed Wendell that he was not required to answer any of the questions posed to him.[7]  (Doc. 39 at 180.)  Wendell answered some of the questions and not others.  (Id. at 34, 180.)  Agents Hueston, Binder, and Keppley did not restrain or coerce Wendell in any way and did not inform Wendell of his Miranda rights because he was not in custody.  (Id. at 33, 154-55, 180-81.)[8]

The primary focus of the interview was the location of any additional assets hidden on the property.  (Doc. 24, Ex. 13 at 4; Doc. 16, Ex. B at 6-7; Doc. 39 at 18, 24, 179.)  Agent Hueston testified that he had learned from a "cooperating defendant"

---

[7]  Wendell denies being so informed.  (Doc. 39 at 20.)

[8]  Wendell testified that he repeatedly asked for a lawyer.  (Doc. 16, Ex. B at 6-7; Doc. 39 at 21-22.)  However, Agents Hueston and Binder denied that Wendell requested counsel.  (Doc. 24, Ex. 13 at 4; Doc. 39 at 157, 183, 185.)

that gold was buried somewhere on the property and that Avery had confirmed that

Wendell had gold buried "somewhere in the county." (Doc. 39 at 162.) Agent

Hueston explained to Wendell that his cooperation in locating any buried gold on

the property would be greatly appreciated so that the agents would not cause more

damage to the home than necessary in attempting to locate the gold.[9] (Id.) In

response, Wendell informed Agent Hueston that some gold was buried in the

backyard of the residence and voluntarily directed Agent Hueston to its location.

(Id. at 161-62.) With Wendell's assistance, the agents unearthed a plastic container

that was encased in concrete. (Doc. 16, Ex. B at 7; Doc. 39 at 26.) Wendell opened

the container with a sledge hammer to prove to Agent Hueston that he "wasn't

lying" about the location of the gold. (Doc. 16, Ex. B at 7; Doc. 39 at 27-28.) Inside

the container, the agents discovered 149 one-ounce gold coins and eight one-ounce

gold bars enclosed in a variety of packaging materials. (Doc. 16, Ex. B at 7-8.)

Upon discovering the gold and silver coins and bars, Agent Binder made the

decision to obtain an amended search warrant for the Primrose Residence, which

included "United States currency, gold coins and bars, and silver coins and bars"

among the list of items to be seized. (Doc. 23 at 8; Doc. 24, Ex. 9; Doc. 39 at 181.)

Agent Binder testified that he was "fairly comfortable" that the items could be

seized pursuant to the initial warrant as evidence of expenditures but that he chose

to obtain the amended warrant "just to be conservative and safe." (Doc. 39 at 181-

---

[9] According to Wendell, Agent Hueston threatened to "tear [the Primrose Residence] apart" if Wendell did not reveal the gold's location. (Doc. 16, Ex. B at 7.)

82.)  The amended warrant was faxed to the Primrose Residence and delivered to

Avery by Agents Binder and Keppley.[10]  (Id. at 186.)   The agents then seized the

discovered items.[11]  (Doc. 24, Ex. 11 at 2.)  Agent Keppley provided Avery with an

inventory of the items seized before leaving the residence.  (Id. at 2-3.)

### B.     Search of the Villa Vista Residence

At 9:05 a.m. on June 1, 2005, IRS agents and uniformed police officers

knocked and announced their presence at the Villa Vista Residence.  (Doc. 24,

Ex. 12 at 1.)  IRS Special Agent Alissa Tyler ("Agent Tyler") testified that she

instructed any individual in the residence to open the door, but no one responded.

After seeing no signs of occupants, the agents entered the residence through an

unlocked door.  (Id.)  Moments later, Gary arrived at the residence and discovered

the team of agents.  (Doc. 16, Ex. B at 9; Doc. 39 at 75.)  Agent Tyler explained to

Gary that a search warrant was being executed and provided him with a copy of the

warrant.  (Doc. 24, Ex. 12 at 1; Doc. 39 at 75-76.)  For security purposes, an agent

remained with Gary at all times; however, Gary was not informed of his Miranda

rights because he was not in custody.  (Doc. 24, Ex. 12 at 1.)

During the course of the search, the agents discovered a large gun safe,

which Gary unlocked at the agents' request.  (Doc. 24, Ex. 13 at 1; Doc. 16, Ex. B at

---

[10]  Avery disputes receiving the amended search warrant.  (Doc. 16, Ex. B at
4.)

[11]  The timing of the seizure was confirmed by Agents McLaughlin, Bowser,
and Binder.  (Doc. 39 at 126, 134, 182.)

9.)   After Gary had opened the safe, IRS Special Agent Christopher D. Kegerreis

("Agent Kegerreis") photographed its contents before a search was conducted.

(Doc. 24, Ex. 13 at 1; Doc. 39 at 166.)  Agent Kegerreis then videotaped IRS Special

Agent Joe Keiper ("Agent Keiper") as he removed loose paper currency and gold

coins from the top shelf of the safe.  (Doc. 24, Ex. 13 at 1; Doc. 39 at 166.)  These

items were inventoried and returned to Gary, who signed a receipt memorializing

their return.  (Doc. 39 at 76-77, 168.)  Agent Kegerreis then asked Gary if there were

any additional valuable coins or paper currency in the residence, and he replied

that there were not.  (Doc. 24, Ex. 13 at 1; Doc. 39 at 77, 168.)

Agent Kegerreis returned to the gun safe to conduct a complete search of the

safe.  (Doc. 24, Ex. 13 at 1.)  Agent Kegerreis located documents that were within the

scope of the warrant, as well as a locked fire safe, the key to the fire safe, a

cardboard box containing 107 gold coins of varying weights, and three plastic boxes

containing 500 one-ounce silver coins.[12]  (Id.; Doc. 16, Ex. B at 10; Doc. 39 at 168-69.)

Agent Kegerreis then opened the fire safe "because it could have contained

documents relative to the case" and found three bundles of paper currency

wrapped in tin foil.  (Doc. 39 at 170.)  The agents unwrapped and inventoried the

paper currency, which totaled approximately $118,000.  (Doc. 24, Ex. 13 at 1; Doc. 39

at 169.)  The agents also opened the plastic boxes containing coins and found a

receipt inside relative to their purchase.  (Doc. 39 at 170-71.)

---

[12]  The silver coins were packaged in containers identical to those discovered
in the Primrose Residence.  (Doc. 16, Ex. B at 10.)

After counting the currency, the agents decided to obtain an amended search warrant for the Villa Vista Residence, which would include paper currency and gold and silver coins and bars among the list of items to be seized.  (Doc. 24, Ex. 13 at 1-2; see also Doc. 24, Ex. 8.)  Agent Kegerreis returned to IRS headquarters in Harrisburg, Pennsylvania to assist in the preparation of the search warrant affidavit.  (Doc. 24, Ex. 13 at 2; Doc. 39 at 172.)  Agent Kegerreis then returned to the Villa Vista Residence, while IRS Special Agent John Strunk obtained the amended warrant.  (Doc. 24, Ex. 13 at 2.)  After the amended warrant was delivered to the Villa Vista Residence, Agent Kegerreis took custody of the paper currency and coins.  (Id.; Doc. 39 at 173.)  Agent Tyler provided Gary with a copy of the amended search warrant before leaving the residence.[13]  (Doc. 24, Ex. 12 at 1; Doc. 39 at 173.)

C.   **Procedural History**

On April 25, 2006, the Sollenbergers filed the instant motions for return of property pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure.  Rule 41(g) states:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return.  The motion must be filed in the district where the property was seized.  The court must receive evidence on any factual issue necessary to decide the motion.  If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

---

[13] Gary denies receiving the amended warrant.  (Doc. 16, Ex. B at 11.)

FED. R. CRIM. P. 41(g).  The Sollenbergers argue that they have been aggrieved by

the unlawful search and seizure of their property in violation of their Fourth and

Fifth Amendment rights.  (Doc. 16 at 7-8.)  The Sollenbergers also argue that they

have been aggrieved by a deprivation of property because the government has

possessed their property for an unreasonable amount of time.  (Id. at 28.)  On

February 23, 2007, the court held a hearing on the Rule 41(g) motion, which is now

ripe for disposition.  See FED. R. CRIM. P. 41(g) (requiring the court to "receive

evidence on any factual issue necessary to decide the motion").

On May 23, 2007, the grand jury returned an indictment charging each of the

Sollenbergers with conspiracy to defraud the United States pursuant to 18 U.S.C.

§ 371.  (Criminal Action No. 1:07-CR-0205, Doc. 1.)  The indictment charges the

Sollenbergers with, *inter alia*, using fraudulent trusts to conceal their business and

personal income and other assets from the IRS.  (Id. ¶ 2.)

## II.   <u>Standard of Review</u>

A motion for return of property pursuant to Federal Rule of Criminal

Procedure 41(g) is the appropriate mechanism for seeking the return of property

that has been unlawfully seized or improperly retained.  See <u>United States v.

Jordan</u>, No. 06-01, 2007 WL 1152652, *1 (W.D. Pa. Apr. 17, 2007) (citing <u>United

States v. Chambers</u>, 192 F.3d 374, 376 (3d Cir. 1999)).  In the Third Circuit, Rule

41(g) motions for the return of property are governed by the standard of

"reasonableness under all of the circumstances."[14]  In re Search Warrant, No. 03-

0008, 2003 WL 22095662, at *5 (D. Del. Sept. 9, 2003); see also United States v.

Lamplugh, 956 F. Supp. 1204, 1206 (M.D. Pa. 1997); Gov't of the V.I. v. Edwards, 903

F.2d 267, 273 (3d Cir. 1990).  In considering such a motion, "a court must weigh the

interest of the government in holding the property against the owner's rights to use

the property."  United States v. Premises Known as 608 Taylor Ave., Apartment

302, 584 F.2d 1297, 1302 (3d Cir. 1978); see also Lamplugh, 956 F. Supp. at 1206.  The

burden of proof for a Rule 41(g) motion shifts depending upon the pendency of a

criminal prosecution.

> If a motion for return of property is made while a criminal prosecution is
> pending, the burden is on the movant to show that he or she is entitled to the
> property.  Generally, a Rule 41[(g)] motion is properly denied if the defendant
> is not entitled to lawful possession of the seized property, the property is
> contraband or subject to forfeiture or the government's need for the property
> as evidence continues.  The burden shifts to the government when the
> criminal proceedings have terminated.  At that point, the person from whom
> the property was seized is presumed to have a right to its return, and the
> government must demonstrate that it has a legitimate reason to retain the
> property.

Chambers, 192 F.3d at 377 (internal citations and quotations omitted); see also

Edwards, 903 F.2d at 274.

---

[14]  The Third Circuit's position is the minority view.  In re Search Warrant,
No. 03-0008, 2003 WL 22095662, at *5 (D. Del. Sept. 9, 2003).  Other circuit courts
have required a showing that there is no adequate remedy at law and that the
movant would be irreparably harmed if the property was not returned.  Id. at *6;
see also United States v. Lamplugh, 956 F. Supp. 1204, 1207 (M.D. Pa. 1997) (citing
Black Hills Inst. of Geological Research v. Dep't of Justice, 967 F.2d 1237, 1239 (8th
Cir. 1992), Floyd v. United States, 860 F.2d 999, 1003 (10th Cir. 1988), and Mr. Lucky
Messenger Serv., Inc. v. United States, 587 F.2d 15, 16 (7th Cir. 1978)).

The Court of Appeals for the Third Circuit has set forth a number of factors that a court should consider when determining whether the government's retention of property is reasonable.  These factors include the length of time that the property was retained and the purposes for which the property was held.  608 Taylor Ave., 584 F.2d at 1303-04.  If the government's sole interest in retaining the property is for its evidentiary value, the court should consider whether there are any alternative means of effectuating this purpose.  Id. at 1304.

### III.   **Discussion**

The Sollenbergers argue that they have been aggrieved by the unlawful search and seizure of their property.  Specifically, the Sollenbergers contend that: (1) the search warrants were facially-invalid general warrants, (2) the agents exceeded the scope of the warrants by searching for and seizing gold, silver, and paper currency, and (3) the agents questioned Wendell in violation of his Fifth Amendment right against self-incrimination.  (Doc. 16 at 7-8.)  The Sollenbergers also argue that they have been aggrieved by a deprivation of property because the government has possessed their property for an unreasonable amount of time. (Doc. 16 at 28.)   The court will address these arguments *seriatim*.

### A.   **Facial Invalidity of Search Warrants**

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and *particularly describing* the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV (emphasis added).  The Fourth Amendment's

14

particularity requirement is intended to prohibit general warrants, which are

warrants that vest the executing officers with unbridled discretion to conduct "a

general exploratory rummaging in a person's belongings." United States v.

Christine, 687 F.2d 749, 752 (3d Cir. 1982) (citing Coolidge v. N.H., 403 U.S. 443, 467

(1971)).  Examples of general warrants are those authorizing searches for and

seizures of "such vague categories of items as 'smuggled goods,' 'obscene

materials,'. . . 'illegally obtained films,' and 'stolen property.'" United States v.

$92,422.57, 307 F.3d 137, 149 (3d Cir. 2002).  In considering whether a warrant is too

general to meet constitutional mandates, a court must read the warrant "as a

whole,"[15] United States v. Johnson, 690 F.2d 60, 64 (3d Cir. 1982), and evaluate it "in

a common sense, non-technical fashion," Doe v. Groody, 361 F.3d 232, 239 (3d Cir.

2004).

    This common sense approach to warrant interpretation dictates that the

Fourth Amendment's particularity requirement be relaxed in instances where "a

more precise description is not feasible," such as investigations "involving complex

schemes spanning many years that can be uncovered only by exacting scrutiny of

intricate financial records." Christine, 687 F.2d at 760; see also United States v.

---

[15] The requirement that a warrant be read as a whole extends to any
documents that accompany the warrant and are incorporated into the warrant by
reference. Bartholomew v. Commonwealth of Pa., 221 F.3d 25, 429 (3d Cir. 2000). In
the action sub judice, the warrants specifically reference the list of items of be seized
as "Attachment E" and state that the attachment is "incorporated by reference."
(Doc. 24, Exs. 1-6.)  Accordingly, the attachment is appropriately considered when
construing the scope of the warrants in the instant case.

Yusuf, 461 F.3d 374, 395 (3d Cir. 1006); United States v. Comite, No. 06-70, 2006 WL 3360282, at *16 (E.D. Pa. Nov. 17, 2006).  The instant case presents just such a complex scheme.  The Sollenbergers are alleged to have participated in a widespread tax evasion conspiracy spanning a number of years and involving a variety of trust entities and companies.  Considering the complexity of this alleged scheme, the court finds that the search warrants are as exacting in detail as can feasibly be required.  The warrants identify the individuals and companies that are believed to have been involved in the alleged criminal activity, delineate twenty categories of items that are properly subject to seizure, and limit such seizure to items from the relevant time period of the investigation.  (See Doc. 24, Ex. 7 at 1.)

Nevertheless, the Sollenbergers argue that the warrants are facially invalid because they do not identify the crime that the Sollenbergers allegedly committed.  (Doc. 16 at 19-21.)  In support of their contention that such a requirement should be imposed, the Sollenbergers cite cases from the United States Courts of Appeals for the Ninth and Tenth Circuits.  See, e.g., United States v. Bridges, 344 F.3d 1010, 1018 (9th Cir. 2003); Voss v. Bergsgaard, 774 F.2d 402, 405 (10th Cir. 1985).  However, even these courts have "demanded specification of the particular offense only when required by statute or when necessary to identify the objects to be seized with sufficient particularity."  United States v. Hill, 55 F.3d 479, 481 (9th Cir. 1995).  These conditions are not present in the instant case.  No statute requires that the offense be identified, and the items to be seized were specifically described in the warrants' attachments.

16

Moreover, the United States Court of Appeals for the Third Circuit has not expressly adopted the requirement that a warrant specify the crime alleged to meet constitutional muster.  In fact, in <u>United States v. $92,422.57</u>, the Third Circuit evaluated a warrant that "did not so much as allude to the illegal activity under investigation" and would have given the executing officers no basis to distinguish between items "relating to suspected illegal conduct and those that were altogether irrelevant and innocuous."[16]  307 F.3d at 155-57.  Despite this, the Third Circuit held that the warrant was specific enough to meet the Fourth Amendment's particularity requirement.  <u>Id.</u> at 149.

The instant warrants are considerably more particular than the warrant upheld in <u>United States v. $92,422.57</u>.  Although the warrants in the instant case do not identify the exact crime that the Sollenbergers are alleged to have committed, a reasonable executing agent could infer from the list of items to be seized that the alleged crime was tax-related and involved the secreting of income in domestic and offshore trusts and bank accounts.  (<u>See</u> Doc. 24, Ex. 7 ¶¶ 5, 7, 10 (permitting seizure

---

[16]  The warrant at issue in <u>United States v. $92,422.57</u> authorized officers to search for and seize the following items:

> 1) Receipts, invoices, lists of business associates, delivery schedules, ledgers, financial statements, cash receipts, disbursement, and sales journals, and correspondence.
> 2) Computers, computer peripherals, related instruction manuals and notes, and software in order to conduct an off-site search for electronic copies of the items listed above.

307 F.3d at 149.

of all "personal, business and trust income tax returns," "all documents and

materials relating to offshore trusts, international business corporations,

international bank accounts and other entities," and all items "evidencing the . . .

secreting [or] concealment . . of money")).  Because the warrants provide the

executing agents with sufficient information to guide the scope of their search and

to limit their exercise of "unbridled discretion," the court finds that the failure to

specify the crime alleged does not violate the Fourth Amendment's particularity

requirement.

The Sollenbergers also contend that the warrants are defective because they

direct the agents to seize *all* financial and business records and "*all* electronic

devices which are capable of analyzing, creating, displaying, converting, storing or

transmitting electronic, magnetic or optical computer impulses or data." (Doc. 16,

Ex. A at 5-6 (emphasis added)).  In essence, the Sollenbergers argue that the

warrants improperly authorize the agents to seize "any scrap of paper" found in the

Sollenbergers' homes and electronic equipment of "such a general nature" that it

could be found in "almost every legitimate business operating today." (Doc. 16 at

18-19.)  This argument is unavailing.  Inclusive warrants actually serve the purpose

of the Fourth Amendment's particularity requirement by hindering the exercise of

unbridled discretion by executing officers.  In <u>Christine</u>, the United States Court of

Appeals for the Third Circuit held that a warrant cannot be invalidated as a general

warrant, provided that it describes "in both specific and inclusive generic terms

what is to be seized."  687 F.2d at 753; <u>see also</u> <u>United States v. $92,422.57</u>, 307 F.3d

18

at 149 (same).  The warrant at issue in <u>Christine</u> authorized police to search for and

seize "*all* folders and *all* documents," "*all* checks, check stubs and bank statements,

deposit slips and withdrawal slips," "*all* general ledgers, general journals, cash

receipt disbursement ledgers and journals," "*all* correspondence," and "*all* other

documents, papers, instrumentalities and fruits of the crime."[17]  687 F.2d at 753

(emphasis added).  The Third Circuit held that because the warrant directed the

executing officers to seize *all* such items, "the magistrate, rather than the officer,

determined what was to be seized."  <u>Id.</u>

Similarly, in the instant case, the warrants are both specific and inclusive.

The executing agents are authorized to seize *all* items that fall within the twenty

categories of items listed in the warrants.  (Doc. 24, Ex. 7.)  While the warrants' list

---

[17]  The exact language of the warrant at issue in <u>Christine</u> was as follows:

(a) all folders and all documents contained therein and all other documents relating to home improvements and home improvement contracts pursuant to the HUD Title I Insured Home Improvement Loan program;
(b) all checks, check stubs and bank statements, deposit slips and withdrawal slips, reflecting the receipt and disbursement of funds through Landmark Builders, Inc. for the period January 1, 1977 to the present;
(c) all general ledgers, general journals, cash receipt disbursement ledgers and journals for the period January 1, 1977 to the present;
(d) all correspondence to and from and submissions to Collective Federal Savings and Loan; and
(e) all other documents, papers, instrumentalities and fruits of the crime of submission of false statements in connection with the HUD Title I Insured Home Improvement Loan program as well as any evidence of a scheme to defraud HUD or Collective Federal Savings and Loan or any other creditor by use of the United States mails.

687 F.2d at 751.

of target items is lengthy, the Fourth Amendment "does not prohibit searches for long lists of documents or other items." United States v. $92,422.57, 307 F.3d at 148. Rather, the Fourth Amendment merely requires that each target item be described with particularity. Id. Here, the warrants' specific and inclusive list clearly indicates to the executing agents and to the Sollenbergers what items are subject to seizure and memorializes the exact type of search that the magistrate judge intended to permit. See Doe, 361 F.3d at 239 (stating that the particularity requirement serves the following purposes: "First, it memorializes precisely what search or seizure the issuing magistrate intended to permit. Second, it confines the officers who are executing the warrant. Third, it informs the subject of the search what can be seized."). Accordingly, the court finds that the warrants at issue do not vest the executing agents with unbridled discretion to seize the Sollenbergers' property. See Christine, 687 F.2d at 752.

For the foregoing reasons, the court finds that the warrants satisfy the particularity requirements of the Fourth Amendment and cannot be invalidated as general warrants. The court will deny the motions for return of property to the extent that they assert that the warrants are facially invalid.

## B.    Exceeding Scope of Search Warrants

If the scope of a search "exceeds that permitted by the terms of a validly issued warrant," the subsequent seizure of the items discovered is unconstitutional. Horton v. California, 496 U.S. 128, 140 (U.S. 1990). During a search pursuant to a warrant, executing officers are permitted to open any containers in which objects

named by the warrant "may reasonably be found."  <u>United States v. Newman</u>, 685

F.2d 90, 92 (3d Cir. 1982).  As the United States Supreme Court has reasoned, when

officers are executing a warrant, "distinctions between closets, drawers, and

containers . . . must give way to the interest in the prompt and efficient completion

of the task at hand."  <u>United States v. Ross</u>, 456 U.S. 798, 821 (1982).  When

determining whether a container may reasonably be opened during the course of a

search pursuant to a warrant, the court's inquiry should be guided by a comparison

of the dimensions of the container to the dimensions of the items sought in the

search warrant.  <u>Newman</u>, 685 F.2d at 92.

The Sollenbergers contend that the agents should not have opened any of the

containers containing coins and other currency because they could not have

"reasonably believed" that items within the scope of the search warrants would be

found there.  (Doc. 16 at 22-23, 26.)  However, the executing officers were primarily

searching for documents and other small items.  (<u>See</u> Doc. 39 at 123, 134, 170.)  The

court finds that documents or keys to other safes or containers could reasonably

have been located in any of the containers that the agents opened, particularly in

light of the number of sealed and, at times, concealed containers on the premises.

In fact, the agents located documents that fell within the scope of the search

warrants in several of the containers.  (<u>See</u> <u>id.</u> at 125, 134, 170-71, 182-83.)

Accordingly, the court finds that the agents did not exceed the scope of the search

warrants by opening containers containing coins and other currency during the

course of their search.

The Fourth Amendment also "prevents the seizure of one thing under a warrant describing another." Doe, 361 F.3d at 243.  The Sollenbergers contend that the agents should not have seized their paper currency or precious metals because such items are not included in the warrants' list of items to be seized.  The government counters that such items fall within the agents' authorization to seize "any . . . items reflecting financial transactions and/or evidencing the obtaining, *secreting*, transferring, *concealment* and or *expenditures* of money of either a personal or business nature."  (Doc. 24, Ex. 7 ¶ 10.)

During the search of the Villa Vista Residence, Agent Kegerreis asked Gary whether there were any additional valuable coins or paper currency in the residence, and Gary responded that there were not.  (Doc. 24, Ex. 13 at 1; Doc. 39 at 77, 168.)  Just minutes after Gary's denial, the agents discovered more than $100,000.00 in paper currency and more than 600 valuable coins in the residence.  (Doc. 24, Ex. 13 at 1; Doc. 39 at 168-69.)  Because Gary denied the existence of the coins and paper currency to Agent Kegerreis, the court finds that the coins and paper currency seized from the Villa Vista Residence fell within the warrants' authorization to seize evidence of secreting or concealment of money.  Likewise, the gold coins and bars discovered in the backyard of the Primrose Residence were stored in an atypical manner that could constitute concealment.  Not only were the coins and bars buried in the ground but they were also encased in a thick layer of concrete that could not be removed without breaking it.  (Doc. 39 at 26.)  Therefore, the court finds that the gold coins and bars discovered in the backyard of the

Primrose Residence were properly seized pursuant to the original search warrant as evidence of concealment of money.  The court also finds that the remaining valuable coins and bars discovered and seized in both residences constituted evidence of expenditures of money as contemplated by the search warrants.  Agent Binder testified that a number of the containers included receipts indicating that the coins and bars had been purchased during the time period relevant to the investigation.  (Id. at 182-83.)  Agent Binder's testimony brings the valuable coins and bars squarely within the expenditure provision of the warrants.[18]

Having found that the search was properly executed and that the seized items fell within the scope of the original search warrants, the court will deny the motions for return of property to the extent that they are premised on the contention that the agents exceeded the scope of the search warrants.

### C.   <u>Interview of Wendell Sollenberger</u>

The self-incrimination clause of the Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  In <u>Miranda v. Arizona</u>, 384

---

[18]  Assuming *arguendo* that the paper currency and valuable coins and bars did not fall within the scope of the original warrant, the seized property clearly fell within the scope of the amended warrants, which specifically listed "United States currency, gold coins and bars, and silver coins and bars" among the items to be seized.  (Doc. 24, Ex. 9.)  These amended warrants were received and served on the Sollenbergers *before* the property was seized.  While the Sollenbergers dispute these contentions, Agents McLaughlin, Bowser, and Binder confirmed the timing of the seizure, while Agents Binder, Keppley, and Tyler corroborated the warrants' service on the Sollenbergers.  (Doc. 39 at 126, 134, 173, 182, 186.)

U.S. 436 (1966), the United States Supreme Court implemented a prophylactic measure designed to protect against violations of the self-incrimination Clause. Pursuant to <u>Miranda</u>, the government is required to advise an individual of his or her rights before commencing a custodial interrogation.  <u>Id.</u> at 444.  In the instant case, the Sollenbergers allege that Wendell was subjected to a custodial interrogation without being advised of his <u>Miranda</u> rights.  (Doc. 16 at 24-26.) During the alleged interrogation, Wendell made statements that led to the discovery of the gold buried in the backyard of the Primrose Residence.  Accordingly, the Sollenbergers argue that the gold's seizure was illegal pursuant to the fruit of the poisonous tree doctrine.  (<u>Id.</u> at 26.)

In the instant case, it is clear that Wendell was questioned by several agents at the Primrose Residence and was not advised of his <u>Miranda</u> rights.  However, the parties dispute whether Wendell was in custody at the time of his interrogation.  To determine whether an individual is in custody for purposes of <u>Miranda</u>, a court must consider the totality of the circumstances as viewed by a reasonable person in the position of the individual being questioned.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 663 (2004).  If such a person would have "felt he or she was not at liberty to terminate the interrogation and leave," then the individual was in custody for purposes of <u>Miranda</u>.  <u>Id.</u>  Among the factors to be considered by a court faced with the custody inquiry are:

(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement, and (5) whether the suspect voluntarily submitted to the questioning.

United States v. Willaman, 437 F3d 354, 359-60 (3d Cir. 2006).

In the instant case, the court finds that a reasonable person in Wendell's position would have felt at liberty to terminate the interrogation. Wendell was informed repeatedly that he was not under arrest and was free to leave. (Doc. 39 at 152-54, 178, 184.) Wendell was questioned in his own home, an environment that is "substantially less intrusive" than an arrest. See Michigan v. Summers, 452 U.S. 692, 702 (1981). In addition, the agents did not physically restrain Wendell or threaten him in any way. (See Doc. 39 at 33, 154-55, 180-81.) While Wendell testified that he revealed the gold's location out of fear that his parents' health would suffer if the search of their home continued, Wendell's parents were advised that they were free to leave the residence, so any risk to their health was self-imposed. (See id. at 9, 25, 152-53, 184.) Wendell was not forced to reveal the gold's location to protect his parents' health. To the contrary, he could have insisted that his parents leave the residence to avoid any future risk to their well-being. His choice to reveal the gold's location rather than to pursue an alternate course of action was entirely voluntary. Accordingly, the court concludes that Wendell's Miranda rights were not violated because he was not in custody at the time that he offered the gold's location.

The court notes that even if Wendell was in custody when he revealed the location of the buried gold, that fact alone would not mandate the conclusion that the gold was illegally seized. The seizure of physical evidence obtained as a result of an individual's unmirandized statements is not automatically illegal as fruit of these statements. Such a seizure is not illegal if the individual's unmirandized statements were voluntary. See United States v. Latz, No. 04-3952, 2005 WL 3529322, at *4 (3d Cir. Dec. 27, 2005) ("[T]he Fourth Amendment does not require suppression of physical evidence discovered as a result of unmirandized but voluntary statements." (citing United States v. DeSumma, 272 F.3d 176, 180-81 (3d Cir. 2001))); see also United States v. Patane, 542 U.S. 630, 636-37 (2004) ("[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial. . . . The Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements."). A statement is considered involuntary when the individual's "will was overborne in such a way as to render his confession the product of coercion." Latz, 2005 WL 3529322, at *4 (quoting Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002)). Determining whether statements were involuntary depends on "the totality of the circumstances in which they were made." Id.

As discussed above, Wendell's statements regarding the location of the gold were voluntary. There is no evidence that the agents held or pointed weapons during their questioning. Nor is there any evidence that the agents otherwise threatened Wendell or used physical force. See id.; DeSumma, 272 F.3d at 178.

26

Wendell's fear for his parents' health was not sufficient to compel his statements

regarding the gold's location, as Wendell possessed a myriad of other means to

protect his parents' well-being.  Given the testimony regarding Wendell's

questioning, the court finds that his statements were voluntary and not coerced.

For the foregoing reasons, the court will deny the motions for return of the

gold buried in the backyard of the Primrose Residence.

### D.   <u>Unlawful Deprivation of Property</u>

The Sollenbergers also argue that even if the search and seizure of their

property was not unlawful, the property should be returned because the

government has withheld it for an unreasonable length of time.  "It is well-settled

that the government may seize evidence for use in an investigation and trial."

<u>United States v. Pompei</u>, 76 F. App'x 483, 484 (3d Cir. 2003).  However, in exercising

its power to seize, the government may not "effect a [d]e facto forfeiture by

retaining the property seized indefinitely."  <u>608 Taylor Ave.</u>, 584 F.2d at 1302.  In

<u>United States v. Lamplugh</u>, our court held that the government's possession of

seized currency and financial records for nearly three years was unreasonable and

amounted to a de facto forfeiture.  956 F. Supp. at 1208.  In reaching its decision, the

court emphasized the government's failure to file any criminal charges or forfeiture

proceedings during the three years that it possessed the seized property.  <u>Id.</u>

In the instant case, the government has possessed the Sollenbergers'

property for more than twenty-six months.  As in <u>Lamplugh</u>, no criminal charges

had been instituted against the Sollenbergers at the time that they filed the instant

Rule 41(g) motions.  See 956 F. Supp. at 1208.  However, this case is readily

distinguishable from Lamplugh because the Sollenbergers have since been indicted

on charges of conspiracy to commit tax fraud.  (Criminal Action No. 1:07-CR-0205,

Doc. 1.)  This indictment provides the government with a significant continuing

interest in the seized property.  Moreover, the government asserts an additional

interest in the Sollenbergers' property beyond its value as evidence - namely, the

tax liens that the government holds against all of the Sollenbergers' property.[19]

(See Doc. 24, Ex. 15.)  The court finds that the government's continuing interest in

the property as evidence and as a potential source to satisfy its outstanding tax liens

---

[19]  While the Sollenbergers argue that the government's tax liens are procedurally invalid, the court finds this argument patently frivolous. At the hearing on the instant motions, the government presented Form 4340 Certificates of Assessments and Payments for each of the Sollenbergers. (Tr. Exs. 19-21.) IRS Revenue Officer Deanna Ramos testified that these certificates represented a summary of the Sollenbergers' taxpayer accounts and indicated that a valid tax assessment had been made against each of the Sollenbergers. (Doc. 39 at 136-49.) A Form 4340 Certificate of Assessments and Payments establishes "a *prima facie* case of liability against a taxpayer." Freck v. Internal Revenue Serv., 37 F.3d 986, 991-92 n.8 (3d Cir. 1994); see also United States v. Jones, 877 F. Supp. 907, 912-13 (D.N.J. 1995); United States v. Nutall, 713 F. Supp. 132, 135 (D. Del. 1989); United States v. Klimek, 952 F. Supp. 1100, 1110 n.17 (E.D. Pa. 1997). Once a certificate of assessments has been proffered, a taxpayer bears the burden of proving that the certificate bears a mistake. Freck 37 F.3d at 991-92 n.8; see also Francisco v. United States, 267 F.3d 303, 319 (3d Cir. 2001). The court finds that the Sollenbergers have failed to meet their burden to rebut the presumed correctness of the certificates of assessments. While the Sollenbergers assert that they did not receive notices and demands for payment or summary assessments as required by law, an "unsupported assertion of non-receipt will not overcome the presumption of correctness" of a certificate of assessments. United States v. Singer, No. 00-4840, 2001 WL 964144, at *2 (E.D. Pa. Aug. 21, 2001).

outweighs the Sollenbergers' interests in the return of their property.  <u>See</u>

<u>Chambers</u>, 192 F.3d at 377; <u>see also</u> <u>608 Taylor Ave.</u>, 584 F.2d at 1302.

Accordingly, the court will deny the Sollenbergers' motions for return of

property to the extent that they are premised on a deprivation of property theory.

**IV.   <u>Conclusion</u>**

For the foregoing reasons, the court finds that the Sollenbergers have neither

been aggrieved by an unlawful search and seizure nor by the deprivation of

property.  Accordingly, the Sollenbergers' motions for return of property will be

denied.

An appropriate order will issue.


<u>  S/ Christopher C. Conner  </u>
CHRISTOPHER C. CONNER
United States District Judge


Dated:        August 13, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **IN RE: SEARCH WARRANTS** | : | **MISC. NOS.** | **1:05-MC-0151** |
| **EXECUTED ON:** | : | | **1:05-MC-0152** |
| | : | | **1:05-MC-0153** |
| **309 PRIMROSE LANE** | : | | **1:05-MC-0154** |
| **HANOVER, PENNSYLVANIA  17331** | : | | **1:05-MC-0155** |
| | : | | **1:05-MC-0156** |
| **15 VILLA VISTA AVENUE** | : | | |
| **HANOVER, PENNSYLVANIA  17331** | : | **(Judge Conner)** | |
| | : | | |
| **95 NORTH ALLWOOD DRIVE** | : | | |
| **HANOVER, PENNSYLVANIA  17331** | : | | |
| | : | | |
| **GARY SOLLENBERGER,** | : | | |
| **AVERY SOLLENBERGER, and** | : | | |
| **WENDELL SOLLENBERGER** | : | | |
| | : | | |

## ORDER

AND NOW, this 13th day of August, 2007, upon consideration of defendants'
Rule 41(g) motions for return of property,[1] and for the reasons stated in the
accompanying memorandum, it is hereby ORDERED that:

1.     The motions for return of property are DENIED.

2.     The Clerk of Court is directed to CLOSE the above-captioned cases.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

---

[1]  (See Misc. No. 1:05-MC-0151, Doc. 15; Misc. No. 1:05-MC-0152, Doc. 15;
Misc. No. 1:05-MC-0153, Doc. 9; Misc. No. 1:05-MC-0154, Doc. 9; Misc. No. 1:05-MC-
0155, Doc. 9; Misc. No. 1:05-MC-0156, Doc. 9.)